William SEARS, et al., Appellants,

v.

CATHOLIC ARCHDIOCESE
OF WASHINGTON, et
al., Appellees.

Nos. 06–CV–1469, 07–CV–23.

District of Columbia Court of Appeals.

Argued March 26, 2008.
Decided Oct. 7, 2010.

David B. Lamb, with whom Laurance J. Ochs, Washington, DC, was on the brief, for appellants.

Christopher T. Handman, with whom Jessica L. Ellsworth, Washington, DC, was on the brief, for appellees.

Before RUIZ, and BLACKBURNE–RIGSBY, Associate Judges, and JOSEY–HERRING, Associate Judge, Superior Court of the District of Columbia.*

RUIZ, Associate Judge:

Appellants appeal from summary judgment dismissing their complaint for a declaration of their ownership in a piece of land—known as "Old Lot 826"—by adverse possession. Appellants (William Sears, Stephen Howard and Alison Kretzschmar) own three properties that back onto Old Lot 826, which is titled to appellees, the Catholic Archdiocese of Washington and Saint Peter's Parochial School (jointly referred to as "Archdiocese"). Appellants claim that the trial court erred in dismissing their complaint for quiet title in Old Lot 826. First, appellants argue that they acquired ownership to Old Lot 826 based on their predecessors' adverse possession, which they say transferred to them by deed when they bought their respective properties. Appellants also assert, in the alternative, that they now own the land as a result of their own adverse possession, after "tacking," or adding, their predecessors' time of adverse possession to their own. We disagree with appellants on both points for the reasons that follow, and affirm the judgment of the trial court.[1]

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. Appellees filed counterclaims for ejectment, trespass, and private nuisance. After the trial

## I. Statement of Facts[2]

### A. *Disputed Old Lot 826*

Appellants' properties—lots 816, 817, and 818, in square 793 of the District of Columbia—are adjacent to each other. On the lots are three adjoining rowhouses, with street addresses at 321, 323 and 323 ½ D Street, S.E. The back of each of these lots abuts a piece of vacant land that was formerly designated as lot 826 ("Old Lot 826"). On the other side of Old Lot 826 was what was formerly known as lot 837 ("Old Lot 837"). Thus, Old Lot 826 was located between appellants' lots (816, 817, and 818) on one side, and Old Lot 837 on the other.

Saint Peter's Parochial School has been on Old Lot 837, which is owned by the Archdiocese and is located at 422 3rd Street, S.E., for many years. In 1950, the Archdiocese acquired Old Lot 826, located right behind the school. On December 23, 1976, the Office of the Surveyor of the District of Columbia combined and subdivided Old Lot 826 with Old Lot 837 into what is now known as lot 25 (where the school is located) and twelve smaller lots (nos. 807–818) in square 793. This appeal concerns appellants' claims that as a result of their ownership of lots 816, 817 and 818, they are also entitled to ownership by adverse possession of Old Lot 826, which is currently part of lot 25, owned by the Archdiocese.[3]

### B. *The Current Owners of Lots 816, 817 and 818*

#### 1) *Lots 816 and 818*

Appellant Sears bought lot 816 from Thomas and Chris Downey ("the Downeys") on March 28, 1996,[4] and lot 818 from Thomas Mahr and Karen Nelson on June 26, 2001.[5] Each deed described the property being conveyed with a metes and bounds description and specified the lot number (*i.e.,* lots 816 and 818) of the deeded property. Neither deed purported to convey, or included a description of, Old Lot 826. To the contrary, in the case of the deed to lot 818, a handwritten note from the seller advised that: "Lot 818 is being sold. Land beyond survey line is part of Lot 25 and is not of record to the seller of [lot 818]." As to lot 816, Ms. Downey warned Sears when he bought it in 1996, that

> we always enjoyed the use of this property, that we held it but we didn't have a deed to it, and that he could legally pursue this if he wanted to.... *I said that all of the land did not convey.* Whatever was on the deed was on the deed, but they had the full use of the yard and that we had always had it too.

(Emphasis added.)[6] Sears testified that he did not receive a quit-claim deed for

court granted summary judgment for appellees on appellants' action for a declaration of ownership, it stayed decision on the counterclaims, and entered a final judgment pursuant to Super. Ct. Civ. R. 54(b) so that appellants could take this appeal.

2. The parties submitted documentary evidence as well as the deposition testimony of the parties and other witnesses.

3. The D.C. property tax records show Saint Peter's Parochial School as the owner of lot 25.

4. The deed was recorded on April 1, 1996.

5. The deed was recorded on June 28, 2001.

6. Sears stated in his deposition that after he bought lot 816, he contacted a lawyer "and asked for his guidance as to how to successfully continue to adversely possess the land that [Sears] acquired through the purchase of [lot 816]." The lawyer advised Sears to try to buy the land from the Archdiocese, but Sears did not pursue his lawyer's advice.

Old Lot 826 when he bought either of lots 816 or 818. He also admitted that he had never paid property taxes on Old Lot 826.

### 2) Lot 817

Appellants Howard and Kretzschmar bought lot 817 from Todd Greentree and Julia Thompson on July 5, 1996.[7] The deed to that lot similarly described the deeded property in metes and bounds and specified that the property "is known for assessment and taxation purposes as Lot 817 in Square 793." The deed contains no description that would include, or made any reference to, Old Lot 826. Howard testified that he did not pay property taxes on Old Lot 826 because "we did not hold title to it."

### C. Use of Old Lot 826

The parties presented conflicting evidence about the extent and nature of the neighbors' use of Old Lot 826 and the Archdiocese's control of the property. Father O'Sullivan, pastor of Saint Peter's Parochial School, testified that when he started serving at the school in 1970, he noticed a chain link fence separating the two lots owned by the Archdiocese (Old Lots 826 and 837). There was an unlocked gate on the fence, which opened to the school side. In the 1990s, the school locked the gate in order to keep the students out of Old Lot 826; the key was kept in the school's office. Father O'Sullivan testified that he had seen other people walk in Old Lot 826 from time to time, and that the school was exercising a "good neighbor policy" by not excluding others from using the property. He also testified that he called the Archdi-

ocese in 1993 when the Downeys tried to "exercise control over that land."

Mary Rockwell, the vice-principal at Saint Peter's Parochial School, testified that the school had installed a lock on the chain link fence at one time, and changed it at a later time. She said that in the 1990s, someone changed the lock and the school did not have a key. The school then removed the lock and installed a new lock. Ms. Rockwell also testified that the school maintained Old Lot 826, cutting down a rose bush there in the 1990s, and regularly cleaning up debris and vines.

William Hagins and his wife were the prior owners of lots 816 and 817. Mr. Hagins testified that in 1970 he replaced a "rusty chain link fence with a broken gate" in the back of his property with a six-foot chain link fence.[8] Mr. Hagins testified that he was not aware that his property line did not extend as far as the fence, and that no one from the church or the school interfered with his use of the property. When he leased the house on lot 816 to Chris and Thomas Downey in 1974,[9] Mr. Hagins said that use of the property extending to the fence was "included in the rent."

Chris Downey testified that she maintained the back of the property—including part of Old Lot 826—like it was her own: she cleared the area and planted a garden, held parties and fundraisers there, and kept a key to the gate on the chain link fence. When a student from the school crawled under the fence to retrieve a ball, Ms. Downey said she would ask the teach-

---

7. The deed was recorded on August 5, 1996. The Downeys had sold lot 817 to Greentree and Thompson in 1993. At that time, Ms. Downey informed them that "the deed did not extend to the use of" Old Lot 826. As noted, they, in turn, sold lot 817 to appellants Howard and Kretzschmar in 1996.

8. Presumably, this is the same fence between Old Lots 826 and 837 mentioned by Father O'Sullivan and Ms. Rockwell.

9. Chris Downey stated that it was 1980 when she and her husband rented the house on lot 816.

er to not let the school children come into her yard.

In 1986, the Downeys bought lots 816 and 817 from the Hagins. When asked about her "understanding of the back portion of the back yard," Ms. Downey answered:

> It was always my understanding that we did not have—we owned by adverse possession. How much of it was unclear, but we knew that we owned part of it by adverse possession, and it had been used that way for many, many years. People had been using it, fencing it in and using it openly before we rented it.

When asked if they had requested a quit-claim deed in order to secure their right in Old Lot 826 when they acquired lots 816 and 817 from the Hagins, however, Ms. Downey said, "I don't even know what that is." Ms. Downey stated that they did "nothing" with the information about adverse possession, and "just continued to enjoy it." When the Downeys sold lot 816 to appellant Sears in 1996, Ms. Downey was "astonished ... [to] realize how short the backyard was with respect to the legal title." As mentioned, she advised Sears that "all of the land did not convey."

Thomas Mahr and Karen Nelson (who sold lot 818 to appellant Sears in 2001) had purchased the lot from Emma McAfee and Irvin William in 1994. Mr. Mahr declared in an affidavit what he knew of his predecessors' use of the property:

> [W]e were told that Ms. McAfee and her sister before her had continuously possessed and occupied the area behind the house all the way to the rear of the chain link fence for more than fifteen years even though the area was not shown on the plat of the lot as being part of Lot 818 which was the lot we were purchasing.

Appellant Sears testified that in 2003, he tore down a chain link fence that stood between Old Lots 826 and 837. In its place, Sears installed an opaque wooden fence. He stated that an official from the school "came over to my house to express concern about erecting the improved—the nicer fence," and "another day or two or more after that, a school person, who might have been the principal ... it was a woman ... expressed similar concerns about this new, nicer fence going up...." After the wooden fence was installed, Sears locked the gate, to which only he and his neighbors—appellants Howard and Kretzschmar—held a key.

Pamela Klobukowski, the school's principal, testified that in August 2003 she saw construction workers "installing a wooden fence at the western and southern boundary of the School's playground." She confronted Sears and "told him he did not have the legal right to take down the chain link fence." The Archdiocese then tore down the wooden fence Sears had put up and replaced it with a chain link fence similar to the one that had long existed between the rear of Saint Peter's Parochial School and Old Lot 826. Appellants filed their lawsuit in January 2004.

## II. Analysis

We review the trial court's grant of summary judgment *de novo*. *See, e.g., Osei–Kuffnor v. Argana*, 618 A.2d 712, 713 (D.C.1993). We examine the evidence in the light most favorable to appellants, who opposed the motion, to determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Super. Ct. Civ. R. 56(c). If there are no disputed issues of material fact, summary judgment is appropriate if the movant is entitled to judgment as a matter of law. *See Wallace v. Skadden,*

*Arps, Slate, Meagher & Flom,* 799 A.2d 381, 385 (D.C.2002). To establish title by adverse possession, appellants must demonstrate possession of the land that is "actual, open and notorious, exclusive, continuous, and hostile," throughout a period of fifteen years. *Smith v. Tippett,* 569 A.2d 1186, 1190 (D.C.1990) (citing *Reid v. Anderson,* 13 App.D.C. 30, 36 (1898)); D.C.Code § 12–301 (2001). Because "courts presume that one who occupies the land of another does so with the latter's consent," the party seeking to establish a claim by adverse possession has the burden of doing so "by clear and convincing evidence." *Smith,* 569 A.2d at 1190;[10] *see Chaconas v. Meyers,* 465 A.2d 379, 382 (D.C.1983) ("Hence, where a claimant relies upon a presumption of adverse use, the landowner may rebut that presumption with contrary evidence of permissive user, either express or implied."). There is also a countervailing presumption, that possession is adverse "whenever there is open and continuous use of another's land for the statutory period ... in the absence of evidence to the contrary." *Smith,* 569 A.2d at 1190.

As the trial court recognized, because the parties disputed whether use of Old Lot 826 by appellants and their predecessors had been so open and hostile—*i.e.,* without the Archdiocese's consent—or exclusive as to constitute adverse possession, summary judgment was improper on whether ownership had vested by adverse possession.[11] We agree with the trial court that, even if we assume that all the elements of adverse possession by appellants and their predecessors for the requisite fifteen years could be proven by clear and convincing evidence, appellants were not lawfully entitled to benefit from their predecessors' adverse possession because 1) their predecessors' ownership of Old Lot 826 (assuming it had vested when appellants bought their properties) was not conveyed to them by deed, and 2) their predecessors' years of adverse possession cannot be "tacked" to the period of adverse possession that appellants claim arising from their own use of Old Lot 826 to make up the requisite fifteen years of open and continuous adverse use. Therefore, appellees were entitled to summary judgment as a matter of law on the appellants' claim of ownership to Old Lot 826.[12]

**10.** Appellants rely on *Hefazi v. Stiglitz,* 862 A.2d 901, 910 (D.C.2004), to argue that the proper burden of proof is preponderance of the evidence. However, *Hefazi,* decided after *Smith,* dealt with the burden to establish a prescriptive easement, not ownership to a separate piece of property. *See also Boccanfuso v. Green,* 91 Conn.App. 296, 880 A.2d 889, 899, (2005) (noting that right to prescriptive easement may be established by preponderance of the evidence, but a claim of ownership by adverse possession must be proven by clear and convincing evidence).

**11.** Appellants presented evidence of their and their predecessor's continued use of Old Lot 826, but there was also evidence that the Archdiocese permitted public access to Old Lot 826, what Father O'Sullivan referred to as a "good neighbor policy." The evidence also suggests that the Downeys understood that they did not own Old Lot 826, and that

they recognized the Archdiocese's superior claim of right. Ms. Downey testified that when she and her husband purchased lots 816 and 817, they knew their property line did not extend as far as the fence, and they passed this information to appellant Sears when he bought lot 816 from them and to the persons who bought lot 817 (and who subsequently sold lot 817 to appellants Howard and Kretzschmar). *See Chaconas,* 465 A.2d at 382. ("[A] user is adverse if not accompanied by any recognition, in express terms or by implication, of a right in the landowner to stop such use now or at some time in the future." (quoting *Manos v. Day Cleaners & Dyers, Inc.,* 91 Ohio App. 361, 108 N.E.2d 347, 349 (1952))).

**12.** That appellants cannot claim ownership in Old Lot 826 does not necessarily mean that the Archdiocese has not lost ownership to

A. *Did the sellers convey Old Lot 826 to appellants?*

■ The trial court concluded that appellants could not base their claim of ownership to Old Lot 826 on their predecessors' ownership by adverse possession because none of appellants' deeds conveyed any interest in Old Lot 826. At oral argument, appellants' counsel contended that, although title to Old Lot 826 "was never perfected by predecessors," that property was nevertheless conveyed to appellants when they acquired adjoining lots 816, 817, and 818. Relying on *Bonds v. Smith*, 79 U.S.App.D.C. 118, 143 F.2d 369 (1944), appellants claim that their acquiring possession of those lots also vested their grantors' ownership of Old Lot 826. In addition, appellants argue that the word "rights," as used in the language of conveyance (which is substantially identical in the three deeds), necessarily included the grantor's adverse possessory rights to Old Lot 826. We think that appellants misread the import of *Bonds* and that theirs is an unreasonable interpretation of the deeds that is at odds with their plain language.

In *Bonds* the court recognized that rights to an easement appurtenant to land were enforceable by a person who had acquired possession of the land through the unprobated will of her godfather. 79 U.S.App.D.C. at 119–20, 143 F.2d at 370–71. The court noted that the will was not necessary to prove privity between the grantee and her predecessor, however, because "[a]nyone rightfully in possession of premises to which an easement is appurtenant may enjoin its obstruction." 79 U.S.App.D.C. at 120, 143 F.2d at 371. Evi-dence showed that the grantee had lived with her godfather for most of her life and that they "continuously, openly, notoriously and adversely used for more than twenty years a four foot right of way over a portion of [the] lot as means of ingress and egress...." 79 U.S.App.D.C. at 119, 143 F.2d at 370. In other words, *Bonds* did not involve a claim of ownership to a separate property by adverse possession, but a right to an easement (created by adverse possession) that was appurtenant to property to which the claimant had title.

With respect to appellants' argument that their predecessors intended to convey ownership of Old Lot 826 in the "rights" language of the deeds, we examine the language of those deeds. The deed to lot 816 provides:

The parties of the first part [Downeys] do hereby grant unto the party of the second part [Sears], in fee simple as Sole Owner, all that piece or parcel of land, together with the improvements, *rights,* privileges and appurtenances to the same belonging, situate in the District of Columbia described as follows [legal description of lot 816, followed by street address].

Similarly, the deed to lot 817 provides: [T]he said parties of the first part [Greentree and Thompson] do grant and convey unto the parties [of the] second part [Howard and Kretzschmar] in fee simple as tenants in common, all that property situate in the District of Columbia described as [legal description of lot 817, followed by street address] ... said land and premises above described or mentioned and hereby intended to be conveyed, together with ... all and ev-

some other person who can prove his or her claim of adverse possession, which "extinguishes" the title holder's right and "vests a perfect title in the adverse holder." *Smith,* 569 A.2d at 1192; *see id.* at 1193 ("Title so acquired by the adverse possessor cannot be divested by acts other than those required where title was acquired by deed." (quoting *El Cerrito, Inc. v. Ryndak,* 60 Wash.2d 847, 376 P.2d 528, 532 (1963))).

ery title, right, privileges, appurtenances and advantages thereunto belonging, or in any way appertaining. . . .

The deed to lot 818 provides:

[T]he said parties of the first part [Mahr and Nelson] do grant unto the said party of the second part [Sears], in fee simple, as *Sole Owner*, the following described land and premises, with the improvements, elements and appurtenances thereunto belonging, situate, lying and being in the District of Columbia, namely [legal description of lot 818].

 The interpretation of deeds, like contracts, is a legal question that we review *de novo*. *See 1010 Potomac Assoc. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C.1984). We note, first, that appellants' argument assumes that their predecessors had already acquired ownership to Old Lot 826 by adverse possession. This is an issue that, as the trial court properly noted, was factually disputed and would have to be presented to the jury. Resolution of that factual dispute was unnecessary in this case, however, because we conclude that, as used in the deeds, the word "rights," without more, does not include conveyance of a parcel of land other than the one expressly described and identified in the deed. Appellants have not cited any authority to support their argument and common sense suggests it should not be so, as "it would be absurd to allow the fee of one piece of land, not mentioned in the deed, to pass as appurtenant to another distinct parcel, which is expressly granted by precise and definite boundaries." *Harris v. Elliott*, 35 U.S. 25, 54, 10 Pet. 25, 9 L.Ed. 333 (1836); *see Baylor v. Soska*, 540 Pa. 435, 658 A.2d 743, 746 (1995) (noting that "the only method by which an adverse possessor may convey the title asserted by adverse possession is to describe in the instrument of conveyance by means minimally acceptable for conveyancing of realty that which is intended to be conveyed").[13] We think the more reasonable reading of the word "rights" in a deed to a particular piece of property corresponds to the generally understood meaning of that term in connection with ownership of land, as a "bundle of property rights. . . . Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.' " *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). In this case, this "bundle of property rights" pertains to the particular property being conveyed in fee simple, which in all the deeds was specifically demarcated by the legal description, respectively, of lots 816, 817 and 818, and in no "minimally acceptable" way could be read as including Old Lot 826.[14] *Baylor*, 658 A.2d at 746; *see also*

---

**13.** Appellants originally relied on the entire "rights, privileges and appurtenances" language in support of their claim. They have, however, abandoned this argument in light of Supreme Court cases noting that "appurtenances" usually refer to easements and servitudes, and not to ownership over adjoining pieces of land. *See, e.g., Humphreys v. McKissock*, 140 U.S. 304, 314, 11 S.Ct. 779, 35 L.Ed. 473 (1891). Appellants have not pressed any argument that the word "privileges" conveyed title to the adjoining lot, and

at oral argument counsel placed sole reliance on the word "rights."

**14.** We are not persuaded by appellants' reliance on *Watson v. Price*, 356 So.2d 625 (Ala. 1987), which held that "no legal description of the property in question" is necessary for its conveyance, unless there is a finding of contrary intent, where there are successive possessors to property claiming by adverse possession. *See id.* at 627. Neither of the "two basic reasons supportive of the rule" given by the Alabama court is present in this case, where the disputed property is no mere

BLACK'S LAW DICTIONARY 1348 (8th ed. 2004) (defining "property right" as "[a] right to *specific property,* whether tangible or intangible") (emphasis added). As the language of the deeds makes clear, the rights transferred are "thereunto [the described property] belonging" (deeds for lots 816, and 817) and "to the same [described property] belonging" (deed for lot 818). Unlike an easement that is said to "run with," and is transferred in conjunction with, a piece of property, *see Bonds,* 79 U.S.App.D.C. at 120, 143 F.2d at 371, a claim of ownership by adverse possession to a separate piece of property belongs to the adverse possessor, and must be separately conveyed.

■ Moreover, the contemporaneous evidence in this case shows that at the time of conveyance the sellers did not intend to convey whatever rights they might have had in Old Lot 826; instead, they expressly *disclaimed* conveying any rights in Old Lot 826 to appellants. In the plat attached to the deed conveying lot 818 to appellant Sears, for example, a hand-written note reads: "Lot 818 is what is being sold. Land beyond the survey line is part of Lot 25 and is not of record to the seller...." On the plat, lot 818 is clearly demarcated and the part of Old Lot 826 adjacent to lot 818 is crossed out.[15] Ms. Downey testified that when she and her husband sold lot 816 to Sears in 1996, she told Sears that the deed did not convey

any part of Old Lot 826, and that Sears could pursue legal action to try to obtain title in his own right.

Our interpretation that the deeds did not convey title to Old Lot 826 is also consistent with appellants' conduct when they purchased lots 816, 817 and 818, as appellants themselves did not act as if they considered that they had acquired an interest in Old Lot 826. They did not request quit-claim deeds to Old Lot 826 at the time they purchased their respective lots from their predecessors, nor has any of them ever paid taxes on Old Lot 826.

On this record, we agree with the trial court's ruling, as a matter of law, that even assuming the appellants' predecessors had obtained ownership by adverse possession of Old Lot 826, that ownership was not conveyed to appellants when they acquired lots 816, 817 and 818.

B. *Can appellants tack on their predecessors' use of the property to fulfill the 15–year requirement for adverse possession?*

Appellants claim, in the alternative, that even if ownership of Old Lot 826 was not conveyed to appellants by deed, the evidence supported that they themselves can claim ownership by "tacking" their own adverse possession to that of their prede-

"small, land-locked parcel[ ]" that the predecessory "ordinarily[ ] intended to convey," *id.,* nor is this a case where the party resisting the claim of ownership by adverse possession (*i.e.,* the Archdiocese) had no interest in making a legitimate claim for itself. *Id.* at 628. Indeed, the Archdiocese did assert its ownership by filing counterclaims for ejectment, trespass and private nuisance. See *supra* note 1; see also *supra* note 12.

**15.** We are aware that in an affidavit submitted in opposition to appellees' motion for summary judgment, Mr. Mahr, who sold lot 818 to Sears, stated that the 2001 deed had

conveyed "all the rights we had in the area ... which included the area that was not shown as part of lot 818 on the plat and for which we did not have [a] deed." This statement, not made until 2005 in the course of this litigation, is not contemporaneous with the deed, or reflected in any of the documents, and therefore cannot serve to render ambiguous contract terms that are otherwise unambiguous. "Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous." *1010 Potomac Assocs.,* 485 A.2d at 205.

cessors.[16] "Tacking" has been defined as "successive, uninterrupted *possessions* by persons between whom privity exists. If such tacked possessions constitute one continuous adverse possession for the statutory period it will be sufficient." *Bonds,* 79 U.S.App.D.C. at 120, 143 F.2d at 371.

We have not had the occasion to discuss tacking in the context of adverse possession to claim ownership in land, rather than easements.[17] We therefore look for guidance to the law of Maryland, from which the common law of the District of Columbia derived. *See, e.g., Solid Rock Church v. Friendship Pub. Charter Sch., Inc.,* 925 A.2d 554, 562 (D.C.2007). The Court of Appeals of Maryland has explained the doctrine of tacking in the context of claims of ownership by adverse possession:

> It is unquestionable that where different persons enter upon land in succession without any privity of estate, the last possessor is not allowed to tack the possession of his predecessors to his own, so as to make out a continuity of possession sufficient to bar the entry of the owner. The reason for this rule is that the possession of the one is not that of the other, because the moment the first occupant quits possession, the constructive possession of the owner is restored, and the entry of the next occupant constitutes him a new disseisor ... The law is clear that such privity may be created by sale and conveyance and possession under it as well as by descent.

*Gore v. Hall,* 206 Md. 485, 112 A.2d 675, 678 (1955).

Although privity for tacking purposes may be established by "sale and conveyance," *id.,* a grantor's adverse possession will not accrue to the benefit of the grantee through tacking when the deed of conveyance expressly excludes conveyance of the disputed parcel. *See Trs. of Broadfording Church of the Brethren v. W. Maryland Ry. Co.,* 262 Md. 84, 277 A.2d 276, 278 (1971) (citing *Louis Sachs & Sons v. Ward,* 182 Md. 385, 35 A.2d 161 (1943) and *Fleischmann v. Hearn,* 141 Md. 463, 118 A. 847 (1922)). Moreover, "[w]here title by adverse possession is inchoate, a deed by grantor which fails to convey such inchoate right is ineffective to create privity which allows tacking." *Wolfe v. Porter,* 405 Pa.Super. 385, 592 A.2d 716, 719 (1991). *See* POWELL ON REAL PROPERTY § 91.10[2] ("Generally, for the purpose of effecting title by adverse possession, where the traditional requisites are present, tacking of periods of possession by successive possessors is permitted against an owner seeking to defeat such title, unless it is shown that the claimant's predecessor in title did not intend to convey the disputed parcel.") (citing cases).

Appellants' complaint to quiet title based on a claim of adverse possession was filed in 2004. Therefore, in order to succeed on their claim, appellants must prove adverse possession going back fifteen years, to 1989. Appellants Sears, Howard and Kretzschmar bought their lots in 1996 (816 and 817), and 2001 (lot 818)—all within the fifteen-year period. Thus, to satisfy the fifteen-year period not only must all appellants show privity between themselves and their immediate predecessors,

---

**16.** Although appellants claimed in their brief that "this is not a tacking case," at oral argument counsel contended that appellants had not abandoned the argument.

**17.** As discussed earlier in the text, *Bonds* discusses "tacking" and refers to "adverse use"

in the context of the right to an easement by virtue of continuous and adverse use. The claim in *Bonds,* however, did not depend on "tacking" the time of possession of a previous adverse user, but on the grantee's right to possession of the property to which the easement was appurtenant.

but appellant Sears also must establish privity between the Downeys (his grantors) and the Hagins, from whom the Downeys bought lot 816 in 1986, and between Mr. Mahr and Ms. Nelson (Sears' grantors) and Mrs. McAfee, who sold lot 818 to them in 1994, after she bought it in 1986.

It is unnecessary to determine whether the necessary privity exists going back the chain of title to 1989 because appellants have failed to establish the first link, that the necessary privity existed between themselves and their immediate predecessors. As we have noted in the previous section, the deeds to appellants described and specified the lots being conveyed and none purported to include any description of, or any reference to rights in, Old Lot 826. Because the deeds on their face "fail[ ] to convey such inchoate right [they are] ineffective to create privity which allows tacking." *Wolfe*, 592 A.2d at 719. Moreover, in the case of lots 816 and 818, the sellers expressly disavowed (either in writing or orally) conveyance of rights to Old Lot 826 to the buyers: the deed to lot 818 had an attached plat with a note declaring that Old Lot 826 was not being conveyed to Sears; and Ms. Downey cautioned Sears that the deed to lot 816 did not include Old Lot 826, advising him that "all of the land did not convey." Such disclaimers by the grantors are an addi-tional reason to preclude a successor's tacking of whatever interest the predecessor might have had. *See Trs. of Broadfording Church of the Brethren*, 277 A.2d at 278. Without that first link establishing privity with their grantors' adverse possessory rights, appellants cannot meet their burden of proving by clear and convincing evidence that they are entitled to claim ownership by adverse possession throughout a fifteen-year period, based on "tacking" their predecessors' rights to their own adverse use of Old Lot 826. *See Gore*, 112 A.2d at 678.

In sum, because the undisputed evidence shows neither that any pre-existing ownership acquired by their predecessors through adverse possession of Old Lot 826 was conveyed to appellants when they acquired their respective lots, nor that appellants can claim ownership by adverse possession in their own right by tacking their predecessors' adverse possession to their own, the trial court did not err in dismissing their complaint for quiet title.

*Affirmed.*